UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-12182-RGS

TIMOTHY BLIXSETH

v.

SAMUEL BYRNE ET AL.

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION TO DISMISS

October 11, 2016

STEARNS, D.J.

This case is one of many involving the bankruptcy estate of the Yellowstone Club, a luxury property development near Big Sky, Montana, and its founders, Timothy Blixseth and Edra Blixseth, long since divorced. In this iteration, Timothy Blixseth alleges that defendants CrossHarbor Capital Partners, LLC, CIP Yellowstone Lending, and Samuel Byrne (CrossHarbor's founder and managing partner) conspired with Edra Blixseth to ruin him financially. Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), for want of a claim worthy of adjudication.

BACKGROUND

The saga of this case is too involuted to warrant an attempt to improve on the rendering offered by Bankruptcy Judge Ralph Kirscher in *Blixseth v.*

*Kirschner (In re Yellowstone Mountain Club, LLC)*, 436 B.R. 598 (Bankr. D. Mont. 2010).[1]  For present purposes, the essential facts alleged in the First Amended Complaint (Complaint) are as follows.

Timothy Blixseth,[2] through various limited liability corporations, founded and developed the Yellowstone Club (Club), an exclusive winter ski resort for the super-rich situated on a pristine mountainside.  On June 28, 2007, Blixseth agreed to sell the Club to Byrne and CrossHarbor for $510 million.  The first phase of the sale was completed in August of 2007, when Byrne and his company paid $54 million for a selection of lots on the Club premises.  Upon completion of due diligence in January of 2008, Byrne and his company entered into an asset purchase agreement with Blixseth for the Club totaling over $455 million (after accounting for the previously purchased lots).

---

[1] The story did not end in 2010, but continues today as Blixseth and his creditors continue to battle over the disposition of his remaining assets, if any.  *See* http://www.wsj.com/articles/ex-real-estate-mogul-timothy-blixseth-ordered-to-pay-286-million-1475177977 (last visited Oct. 11, 2016). The Club, on the other hand, has survived hard times and is by all accounts prospering.  *See* http://dealbook.nytimes.com/2014/12/31/huge-ski-resort-for-the-rich-is-bouncing-back/?_r=0 (last visited Oct. 11, 2016).

[2] For ease of exposition, throughout the remainder of this opinion, "Blixseth" will refer to plaintiff Timothy Blixseth, while "Edra" will denote his ex-wife, Edra Blixseth.

The relationship between Blixseth and the defendants began almost immediately to sour. Blixseth blames the deterioration on a Byzantine conspiracy between Edra and Byrne to steal his interest in the Club in the Blixseths' then-pending divorce proceeding. The conspiracy is alleged to have unfolded as follows. On March 21, 2008, Edra dispatched an unnamed agent to Boston to meet with Byrne. Five days later, on March 26, 2008, Byrne and CrossHarbor terminated the asset purchase agreement. To cast an aura of legitimacy on the termination, Byrne and Edra disseminated letters falsely naming Blixseth as the target of a grand jury investigation.[3]

Blixseth and Edra reached a marital settlement agreement (MSA) on June 26, 2008. As part of the MSA, Edra released Blixseth from any liability for the numerous debts incurred by the business entities that were transferred to Edra, including those of the Club. The MSA also required Edra to make a multi-million dollar cash payment to Blixseth. On August 7, 2008, Edra took two bridge loans totaling $35 million from CIP Yellowstone Lending (a CrossHarbor subsidiary) and agreed that defendants would collaborate with her on development efforts at the Club.

---

[3] According to Judge Kirscher, the sale fell through when Byrne realized that Blixseth could not bring enough money to the closing to satisfy the Club's current liabilities. *In re Yellowstone Mtn. Club,* 436 B.R. at 631.

According to Blixseth, these transactions gave CrossHarbor "total management and ownership control over the Yellowstone Club and Edra personally, to the extent that Byrne expressly prevented Edra from complying with provisions of the MSA." Am. Compl. ¶ 69. Blixseth contends that Byrne knew that Edra could never repay the loans, and when she inevitably defaulted, forced her to put the Club into bankruptcy. The plot came to fruition when CrossHarbor purchased the Club in the bankruptcy proceedings at a fire sale price.

Blixseth filed this action in the Central District of California in April of 2010, asserting ten state-law claims. That court ordered the case transferred to the District of Massachusetts in November of 2010. After the filing of the defendants' motion to dismiss and an initial round of briefing, the court ordered a stay while the bankruptcy proceedings against Blixseth wended their way through the federal courts. Five years later, defendants moved to reopen the case. Blixseth did not oppose that motion. The court then lifted the stay and invited supplemental briefing on the original motion to dismiss. Defendants have supplemented their briefs; Blixseth has not.

## DISCUSSION

Defendants first argue that Blixseth's claims are barred by the doctrine of issue preclusion (more commonly known as collateral estoppel).

Specifically, they point out that in the bankruptcy proceeding, Blixseth claimed "that Edra, in the period of time between mid-August of 2008 and November 10, 2008, concocted a scheme with Byrne to drive the [Club] into bankruptcy so that Byrne could purchase the [Club] at a deep discount." *In re Yellowstone Mtn. Club*, 436 B.R. at 641. The argument was intended to support Blixseth's contention that the proximate cause of the bankruptcy was not his own misdeeds, but "the conduct of other persons, including but not limited to, the collusion of Edra, Sam Byrne and CrossHarbor Capital to thwart a purchase of the [Club] by the filing of a Chapter 11 petition in bad faith." *Id*. at 643. The Bankruptcy Court, however, dismissed the theory as a gossamer confection. *Id*. at 641, 663. In its final amended judgment, the Court expressly held that there was no factual foundation to support a finding "that the MSA, and the entire divorce proceeding, was a fraud orchestrated by Byrne." *Blixseth v. Kirschner (In re Yellowstone Mtn. Club, LLC)*, 2012 WL 6043282, at *3 (Bankr. D. Mont. Dec. 5, 2012).[4]

As the parties recognize, with respect to issue preclusion, federal law applies. *See Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 (1st

---

[4] This echoed a conclusion reached by Judge Kirscher two years earlier. See *In re Yellowstone Mtn. Club*, 436 B.R. at 663 ("The Court has not yet seen any credible evidence to support this particular conspiracy theory asserted by Blixseth [that Byrne had conspired with Edra to force the Club into bankruptcy].").

Cir. 1995). Under federal law, the party invoking collateral estoppel must demonstrate "that (1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment." *Ramallo Bros. Printing, Inc. v. El Día, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007). The parties to the second action need not be identical to those in the first action, so long as the party against whom issue preclusion is sought "has had a full and fair opportunity for judicial resolution of the same issue." *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 771 (1st Cir. 2010) (quoting *Fiumara v. Fireman's Fund Ins. Cos.*, 746 F.2d 87, 92 (1st Cir. 1984)).

The dispositive issue here is whether the issues litigated in the Montana proceeding are, for all practical purposes, identical to those asserted in his Complaint. To be sure, Blixseth recycles many of the "facts" that he used to buttress his conspiracy theory in the bankruptcy proceeding. *See, e.g.*, Am. Compl. ¶ 43 ("[B]eginning in March 2008, Byrne and Edra created a scheme whereby Edra would insist on obtaining the Yellowstone Club from Mr. Blixseth as a condition of a marital settlement between them, and Byrne would arrange whatever financing would be needed to effectuate

the Marital Settlement Agreement for Edra."). But mere factual similarity is not enough; "the reach of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all [material] respects to that decided in the first proceeding.'" *Faigin v. Kelly*, 184 F.3d 67, 78 (1st Cir. 1999) (quoting *C.I.R. v. Sunnen*, 333 U.S. 591, 599-600 (1948)). Thus, "the issues must be defined by reference to the judicial determinations at stake." *Id.*

The bankruptcy proceeding culminated in three conclusions of import to the issues at hand. First, the Bankruptcy Court found that Blixseth had engaged in a series of fraudulent transfers, including the siphoning of over $200 million from the Club for his personal use. *In re Yellowstone Mtn. Club*, 436 B.R. at 644, 655-660. Second, it ruled that the releases Blixseth obtained from Edra through the MSA were fraudulent and unenforceable. *Id.* at 660-668. Finally, it held that Blixseth had breached his fiduciary duties to the Club and to the minority investors in the Club-related limited liability companies he had created. *Id.* at 669-671.[5]

---

[5] All of these conclusions were subsequently affirmed, first by the district court, *see Blixseth v. Glasser* (*In re Yellowstone Mtn. Club, LLC*), 2014 WL 1369363 (D. Mont. Apr. 7, 2014), and then by the Ninth Circuit, *see Blixseth v. Glasser* (*In re: Yellowstone Mtn. Club, LLC*), 2016 WL 3947830 (9th Cir. July 22, 2016).

To the extent that Blixseth's claims in the present action rest on Edra's purported failure to abide by the releases declared fraudulent in the bankruptcy action, they are clearly barred. But Blixseth's present claims go beyond reliance on the releases by asserting the following: (1) that defendants aided and abetted Edra's breach of her fiduciary duty to Blixseth arising from the divorce proceeding; (2) that defendants interfered with Blixseth's contractual relations or prospective business relations arising from the MSA; and (3) that defendants breached fiduciary duties of disclosure to Blixseth regarding their dealings with Edra concerning the Club. These issues were not adjudicated in the bankruptcy proceeding, which focused on Blixseth's personal culpability for the Club's bankruptcy. The fact that the bankruptcy was not precipitated by a conspiracy among Edra and the defendants does not compel the conclusion that Edra and the defendants owed no duties to Blixseth.

The dispute, however, is ultimately one of limited academic interest. Blixseth's Complaint is a hodgepodge of conspiratorial imaginings, conclusory and contradictory assertions of fact, and overheated rhetoric. To cross the plausibility threshold to defeat a motion to dismiss, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). Merely reciting the elements of a cause of action adorned with the prediction that each is or will be met during the course of discovery does not suffice. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 8 (1st Cir. 2011).

Boiled down to its core, Blixseth's Complaint relies on his efforts to portray Byrne as a master puppeteer orchestrating the actions of his puppet Edra. The faint outlines of this portrait come nowhere clearer in focus than in Count II, in which Blixseth contends that defendants breached a fiduciary duty they owed directly to him. In support of this contention, Blixseth argues that "[a]s a result of Byrne's total control over Edra's ability to pay her bills and meet her obligations," a fiduciary duty arose "to Edra's creditors, including Plaintiff." Am. Compl. ¶ 113. The law, however, does not impose a fiduciary duty on a lender for the benefit of a borrower's third-party creditors. *See Resolution Trust Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1214 (9th Cir. 1994); *Schwan's Sales Enters., Inc. v. Commerce Bank & Trust Co.*, 397 F. Supp. 2d 189, 195 (D. Mass. 2005).[6]

---

[6] The parties engage in a running skirmish about whether California or Massachusetts law applies to many of the counts in the Complaint. Rather than engage in a choice-of-law analysis for claims doomed to fail regardless of which state's law is applied, the court will provide parallel citations, as necessary, throughout this opinion.

A limited exception arises where a lender exercises unqualified control over a borrower. *See FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 103 (1st Cir. 2009) (control must extend to the day-to-day operations of the debtor); *Wagner v. Benson*, 101 Cal. App. 3d 27, 35 (1980) ("extensive control and shared profits"). Although Blixseth asserts that the loan and associated agreement gave CrossHarbor and Byrne "total management and ownership control over the Yellowstone Club and Edra personally," Am. Compl. ¶ 69, there is no *factual* content (such as allegations about how this agreement was to be carried out, the structure of the Club's management or operations, Club decisions that defendants made or participated in, or the sharing of profits) to back up this conclusory assertion. This failure is particularly glaring given that even a very high level of involvement in a debtor enterprise does not create a fiduciary duty. *See, e.g., FDIC v. Fordham (In re Fordham)*, 130 B.R. 632, 649 (Bankr. D. Mass. 1991) (holding that "meeting with the consulting engineers, reviewing and approving construction plans, approving the construction manager, and reviewing requisitions to the extent necessary to justify a corresponding disbursement" did not suffice to show total control). Indeed, Blixseth's Complaint suggests there are no facts from which he could make this showing, as he alleges that defendants took no steps to satisfy their

(unspecified) obligations to the Club under the development agreement. Am. Compl. ¶¶ 74, 78.

The same is true of Blixseth's claim that defendants exercised a degree of control sufficient to invoke the related "instrumentality" doctrine. Under this doctrine, a lender may be liable for the debts of a borrower where "the lender exerts such a degree of control over the borrower that the borrower becomes a mere business conduit for the lender." *FAMM Steel*, 571 F.3d at 104. Neither creditor status nor participation in the management of a debtor corporation is sufficient to demonstrate the requisite degree of control. *Id.* at 105. The utter lack of facts alleged to support a claim of dominant control dooms this theory as well.[7]

Blixseth next attempts to hold defendants liable for Edra's alleged breaches of duty by claiming that she effectively formed a *de facto* joint venture or partnership with defendants. *See* Cal. Corp. Code § 16306(a) (partners are liable for partnership debts); *Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1670 (1997) ("Normally . . . a partnership or joint venture is liable to an injured third party for the torts of a partner or venturer

---

[7] Even if there were adequate allegations of control, the instrumentality doctrine would not result in a breach of fiduciary duty to Blixseth. The doctrine addresses liability for a debtor corporation's debts and does not create fiduciary duties. *See FAMM Steel*, 571 F.3d at 104.

11

acting in furtherance of the enterprise."). Assuming that such a relationship in fact existed, there is no indication that Blixseth had any link with this hypothesized *de facto* entity which might lead to viable claims. At most, he has pointed to possible claims against Edra personally stemming from her breaches of the MSA. The same is true of Blixseth's invocation of the rule that officers and directors of an insolvent corporation have a fiduciary duty to preserve the corporation's assets. There is simply no evidentiary support for the suggestion that defendants were officers or directors of any insolvent corporation, much less one that owed Blixseth money.

Because Blixseth cannot attribute Edra's actions to defendants on the basis of any of his legal theories, several other counts of his Complaint collapse under the same load: to wit, Count V claims a fraud by the defendants based on asserted violations of an alleged fiduciary duty of disclosure. *See* Am. Compl. ¶¶ 128, 132. Similarly, Count I alleges that the defendants aided and abetted Edra's breach of her fiduciary duty to Blixseth arising from the divorce proceedings. Even assuming that the duty Blixseth invokes exists,[8] he has failed to allege facts establishing the fundamental

---

[8] Under California law, the parties to a divorce proceeding owe a fiduciary duty to one another with respect to community property "until such time as the assets and liabilities have been divided by the parties or by a court." Cal. Fam. Code § 1100(e). It appears from Blixseth's Complaint that the MSA was approved by the California state court on July 3, 2008.

element of an aiding and abetting claim: that defendants took some concrete act to facilitate Edra's alleged breach (or stood by ready to do so). *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1477 (2014); *Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*, 447 Mass. 616, 623-624 (2006). The Complaint merely asserts that "Byrne expressly prevented Edra from complying with provisions of the MSA." Am. Compl. ¶ 69. How Byrne accomplished this is never explained. To the contrary, the only factual allegation linking Byrne to an MSA provision is the admission that the loan to Edra was intended to enable Edra to *fulfill* her obligations *to Blixseth* under the MSA. *See* Am. Compl. ¶¶ 66, 81, 109.

In a similar vein, Count III alleges that defendants intentionally interfered with Blixseth's contractual relations stemming from the MSA by "specifically prohibiting" Edra from "making all of the payments called for in the [MSA]." Am. Compl. ¶ 119. But there is simply nothing alleged that would permit a determination that Byrne prevented Edra from doing anything. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589-590 (Cal. 1990) ("[I]ntentional acts designed to induce a breach or disruption

---

Blixseth, however, asserts that the MSA did not become final until August 13, 2008, and that Edra's fiduciary duties continued to that point. Because the MSA is not part of the record, the court is unable to make a definitive determination about the duration of Edra's duties.

of the contractual relationship" comprise an essential element of the tort); *Draghetti v. Chmielewski*, 416 Mass. 808, 816 (1994) (a defendant must "knowingly induce[]" a breach of contract and that interference must be "improper in motive or means").

Count IV's allegation of an intentional interference with Blixseth's prospective business relations is equally hopeless. To establish the tort, a plaintiff must show, *inter alia*, that some actual relationship or expectancy rested with a third party, and that the defendant took some improper action to interfere with that relationship. *See Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 290 (Cal. 2008); *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 397 (1996). Blixseth alleges no more than that he "had an economic relationship with numerous third parties, including Edra and several entities that [Blixseth] obtained pursuant to the MSA." Am. Compl. ¶ 123. It is left to the reader to guess precisely what advantageous relationship that defendants might have pounced on (and in any event there are no factual allegations describing an actual ambush).[9] *See, e.g., Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994).

---

[9] In his opposition to the motion to dismiss, Blixseth argues that he had a prospective economic relationship with Edra attributable to the MSA releases and his "continuing participation in the Yellowstone Club." Opp'n at 21. The releases, however, were determined to be fraudulent in the Montana bankruptcy proceeding, and cannot form the basis of a legitimate

Blixseth's equitable claims are also easily dispatched. Count VII asserts a claim of unjust enrichment against defendants based on their "control" of Edra and their acquisition of the Yellowstone Club at an unfairly discounted price. Unjust enrichment, however, is an equitable recourse that is denied to a plaintiff like Blixseth whose fraudulent conduct and fiduciary breaches were the moving force in the Club's near-death downward spiral. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009) (noting "the primacy of equitable concerns" in addressing unjust enrichment claims under Massachusetts law); *First Nationwide Sav. v. Perry*, 11 Cal. App. 4th 1657, 1665 (1992) ("[A]n unjust enrichment claim is based upon equitable principles.").

Count VIII seeks equitable indemnification. Equitable indemnification attaches when parties share liability for a tort, *see Stop Loss Ins. Brokers, Inc. v. Brown & Toland Med. Grp.*, 143 Cal. App. 4th 1036, 1040 (2006); *Greater Bos. Cable Corp. v. White Mtn. Cable Constr. Corp.*, 414 Mass. 76, 79 (1992), or arises from an express or implied contractual agreement, *see Stop Loss Ins. Brokers*, 143 Cal. App. 4th at 1040-1041; *Fall*

---

expectancy. *See In re Yellowstone Mtn. Club,* 436 B.R. at 660-668. In addition, Blixseth does not identify what "continuing" interest he had in the Club, which the MSA awarded to Edra after a bitter and protracted divorce proceeding.

*River Hous. Auth. v. H.V. Collins Co.*, 414 Mass. 10, 13-14 (1992). There is simply no allegation in the Complaint that Blixseth and the defendants share liability for any tort committed against anyone. Moreover, Blixseth and the defendants had no mutual contractual arrangement after March of 2008.

That leaves only Count VI, which alleges that defendants defamed Blixseth by disseminating false grand jury target letters. Blixseth bases this claim on California law, which, as defendants note, imposes a one-year statute of limitations on defamation actions. *See* Cal. Civ. Proc. Code § 340(c). An affirmative defense like the statute of limitations may, as a rule, only be raised by way of a motion to dismiss when the facts supporting the defense are apparent from the face of the pleadings. *See Trans-Spec Truck Serv., Inc.* v. *Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) ("Where the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate."). Blixseth, not surprisingly, relies on this rule in resisting a statute of limitations bar. As he points out, his Complaint studiously avoids any mention of the date of the single incident of publication to a *Wall Street Journal* reporter of the fabricated grand jury letters. Equally unsurprising is the reluctance of the court to

16

countenance this transparent attempt to circumvent the statute of limitations. There is nothing new to Blixseth's ploy. It has been essayed enough times to lead wary courts into requiring at the outset that defamation plaintiffs come forward with sufficient facts to permit a determination whether the limitations period has expired. *See, e.g.*, *Jones v. Thyssenkrupp Elevator Corp.*, 2006 WL 680553, at *6-7 (N.D. Cal. Mar. 14, 2006).

Although this approach is appealing, Blixseth's own pleadings, despite their crafted dodginess, exclude the possibility that the alleged defamatory publication took place in the year prior to the filing of the Complaint. Blixseth brought suit on April 23, 2010. The Complaint alleges that the defamatory letters were generated "[a]t the same time" as Blixseth and CrossHarbor were finalizing the failed agreement to purchase the Club in March of 2008, and that the letters were fabricated to "undermine [Blixseth's] ability to close the sale," as well as to diminish his support among Club members, thus clearing the way for his ultimate ouster by Edra and Byrne. Am. Compl. ¶ 47. Although the Complaint states that the letters were given to a *Wall Street Journal* reporter "[a]t times presently unknown," *id.*, it also alleges that "upon receipt of the false 'Grand Jury Target Letters' . . . the Defendants disseminated copies of those false letters to third parties, including *The Wall Street Journal*." Am. Compl. ¶ 137. The only sensible

17

chronology to be wrung from these allegations dates the dissemination of the letters to March of 2008, prior to CrossHarbor's termination of the purchase and sale agreement, or at the latest in mid-August of 2008, when ownership of the Club was transferred by the MSA from Blixseth to Edra.

Blixseth attempts a final "Hail Mary," citing the rule that every act of publication gives rise to a separate cause of action for defamation. *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003). Yet the Complaint fails to identify any publication of the allegedly defamatory letters apart from the dissemination to a *Wall Street Journal* reporter. Count VI is plainly barred by the statute of limitations.

Finally, Counts IX and X fail as purely derivative claims. Count IX asserts a claim for civil conspiracy. Civil conspiracy is not a generic cause of action, but must be based on a concerted effort by defendants to commit an underlying tort directed at a plaintiff. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994); *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998).[10] Given the court's determination that none of the

---

[10] Massachusetts will entertain a cause of action for civil conspiracy despite the absence of an underlying tort where a combination of defendants exercises a unique coercive power over a plaintiff. *See Kurker*, 44 Mass. App. Ct. at 188. In his briefing, Blixseth explicitly relies only on California law, and asserts that he does not seek to "collect damages solely for the existence of a civil conspiracy." Opp'n at 28.

underlying torts are adequately pled, Count IX does not survive. Count X seeks punitive damages under California law, but the statute authorizing special damages also requires an underlying breach of a non-contractual duty. *See* Cal. Civ. Code § 3294. None is shown here.

## ORDER

For the foregoing reasons, defendants' motion to dismiss is <u>ALLOWED</u>. The Clerk is directed to close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE